UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Bruce Weiner, | Case Number: _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Robert O. Naegele, III, | |
| Defendant. | |

---

Plaintiff Bruce Weiner ("Weiner") as and for his Complaint against defendant Robert O. Naegele, III, ("Naegele") states and alleges as follows:

## INTRODUCTION

1. Weiner, one member of the closely-held limited liability company, Breckenridge Investors, LLC, ("BI") brings this action against BI's other member, Naegele because he has breached the agreement between the members and has further breached the duties of loyalty, good faith and fair dealing, and full disclosure that he owes to BI and its members. Weiner seeks relief for these breaches in the form of damages, declaratory relief, and other equitable relief.

## THE PARTIES

2. Weiner is a Florida resident, residing at 1300 Ben Franklin Drive, Unit 501, in Sarasota, Florida.

3. Naegele is a Colorado resident, residing at 1104 County Road 112, in Carbondale, Colorado. Naegele has conducted business in Minnesota, including certain actions and omissions that serve as the basis for this Complaint.

## JURISDICTION AND VENUE

4. Jurisdiction over Plaintiff's claims is based on 28 U.S.C. § 1332. Weiner and Naegele are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue of this action is proper under 28 U.S.C. § 1391. A substantial part of the events and omissions that form the basis of this Complaint occurred in this district.

## FACTUAL BACKGROUND

*Formation and Controlling Agreements of Corporate Entities*

6. BI is a closely-held limited liability corporation formed under the laws of Minnesota and specifically subject to Minn. Stat. Ch. 322B. It was formed for the purposes of investing in certain real estate development projects in Breckenridge, Colorado (the "Project").

7. BI consists of only two members: Weiner and Naegele. Weiner is a 66.67% owner and Naegele owns 33.33%. While Weiner contributed a greater portion of capital and thus had a greater financial interest in BI, the members had equal governance rights.

8. Summit Holdings, LLC, ("Summit") is a Minnesota limited liability company that is wholly owned by BI. Summit was formed for the purposes of providing additional funding to the Project.

9. Naegele was named as the Governor of BI. He also served as BI's Chief Manager, Chief Executive Officer, Chief Financial Officer/Treasurer, President, and Secretary. As such, he was responsible for the day-to-day management of BI. Nonetheless, the corporate documents placed specific limits on Naegele's exercise of that management.

10. BI's Articles of Organization made clear that, as a Governor, Naegele owed BI and its members a duty of loyalty and the duty to act in good faith, and it expressly provided that Naegele could not conduct the business for any improper personal benefit.

11. BI's Member Control Agreement provided that "Major Decisions," as further defined by the Agreement, could only be made by a majority of voting members and that no single member had the authority to act alone on such Major Decisions. Relevant to the current dispute, the Member Control Agreement identified the making of any expenditure in an aggregate amount of more than $1,000.00 as a Major Decision, requiring approval by a majority of the voting members.

***The Project***

12. The Project consisted of two separate developments, including a group of duplexes known as the Shores and condominiums known as Shock Hill. A representative

diagram of the Project and the various ownership and financing interests in the Project is attached to this Complaint as Exhibit A.

13. John D. Niemi ("Niemi") was the developer of the Project. Naegele became aware of the Project due to his longstanding personal relationship with Niemi. In deciding to form BI and Summit, and in agreeing to certain investments in the project, Weiner was unaware of the extent of Naegele's personal relationship with Niemi. While he knew that some sort of relationship existed, he was not made aware of the duration and depth of the relationship until long after the entities were formed and the investments were made.

14. Prior to making any investment, Niemi informed BI that one of the Project lenders, Merchants Mortgage & Trust Corporation ("Merchants") wanted to sell the mezzanine debt on the Project. The term "mezzanine" in this context is used to describe the subordinated position that this debt would have to the debt of the senior lenders for the Shores and Shock Hill. Because the debt would be subordinate, the purchasers of the mezzanine debt would have second liens on the assets of the Shores and Shock Hill, junior to the first liens held by the senior lenders.

15. In April 2009, Summit purchased the mezzanine debt from Merchants for $3 million. At that time, the mezzanine debt had a face value of $6.2 million. Interest was to accrue on the debt at a rate of 16% per year. The named borrowers under the mezzanine debt were AZCO LLC ("AZCO") and AZCO II ("AZCO II") LLC, the

Project ownership vehicles formed by the developers for the Shores and Shock Hill portions of the Project, respectively.

16.  The mezzanine debt purchased by Summit was guaranteed by four separate Guaranty Agreements (collectively, the "Guaranties").  The guarantors of the Guaranties included Niemi, Loren M. Gerch ("Gerch"), Robert W. Verratti ("Verratti"), and Mesatex LLC ('Mesatex").  Mesatex was the primary equity ownership vehicle of Niemi and a number of other individual equity investors; it owned majority interests in both AZCO and AZCO II.  Niemi was one of the owners of Mesatex; he also served as the manager of Mesatex.  Each Guaranty is for the full amount due under the mezzanine debt note and is a "joint and several" obligation separate from each of the other Guaranties.

17.  In evaluating the purchase of the mezzanine debt, Naegele assured Weiner that the guarantors had sufficient net worth to guaranty the debt.  Naegele further told Weiner that both Gerch and Verratti were also investors in the project.  Weiner later learned that Naegele had a personal relationship with both Gerch and Verratti.

18.  To provide further funding for the Project, BI made an additional loan to Mesatex in the principal amount of $500,000.00.  Funds lent to Mesatex were used by the developer for payments into an interest reserve of the senior lender to Shock Hill, as well as other Project purposes.  In June 2009, BI increased the amount of the BI Loan to approximately $1,000,000.00**,** again intended for an interest reserve for the Shock Hill

senior lender and other Project purposes. The BI Loan was personally guarantied by Niemi and his wife, Suzanne Niemi.

*__Default on Loans, Promissory Notes and Guarantees.__*

19. In July 2010, the Project lender foreclosed on the Shores.

20. Prior to foreclosure and before BI issued defaults on the various Project investments, Weiner made repeated proposals to attempt to recover the investment. At every proposal, Naegele represented that his close relationship with Niemi would lead to a total recovery of the investment in the Project for BI and Summit as long as Weiner followed Naegele's recommended course of action. On several occasions, Naegele represented that the guarantors would file for bankruptcy if Weiner took certain actions, such as attempting to purchase the project, inquiring about gaining some control over project decision-making, or litigating against the guarantors. Naegele claimed that he did not want his friends to have to file bankruptcy. Through these comments, Weiner came to learn that the depth and the duration of the relationship between Naegele and Niemi were much more significant than initially disclosed.

21. By September 2010, each of the investments was in default. Summit issued a Notice of Default to all of the mezzanine loan guarantors for their failure to make required payments on the mezzanine debt. BI issued a Notice of Default to Mesatex and to John and Suzanne Niemi for their failure to make required payments on the BI Loan. Two of the guarantors did not respond to the BI Notices of Default at all; Niemi

6

responded with a verbal proposal to resolve the matter but has refused to put anything in writing.

*<u>Naegele Refuses to Enforce Personal Guaranties or Other Terms of Investment</u>*

22. When the loans went into default, Weiner recommended to Naegele that BI and Summit pursue legal action against the guarantors. Together with Naegele, they hired Colorado counsel to review the legal options and recommend a course of action to protect BI's and Summit's interests.

23. Colorado counsel recommended that BI commence legal action against the guarantors, advising that, if the guarantors truly had no resources, the matter should quickly result in a default judgment. If the guarantors had resources, litigation would be more costly, but the guarantors would have the assets to satisfy a judgment against them.

24. Naegele took the position that the guarantors had no assets and that litigation would be futile. He said he knew this because of his close personal relationship with the guarantors. The guarantors, however, still have assets and none have filed for bankruptcy.

25. Naegele spent months stating his preference for reaching a settlement with the guarantors, and yet he never submitted a written settlement proposal to resolve the defaults. To date, none of the guarantors have fulfilled any of their obligations to Summit or BI.

26. As a member of BI, Naegele refused to authorize litigation against the guarantors, expressing his belief that the guarantors had no resources, and indicating that

7

to pursue litigation would simply be "throwing good money after bad." To address this concern, Weiner offered to personally provide the money needed to pursue the litigation. As such, Weiner would take on all the risk of any such litigation. Still, Naegele refused to provide his consent, but has offered no other justification for such refusal. Naegele appears to refuse to take any action against Niemi or the other guarantors based primarily on his long-term friendship with them.

### *Naegele Incurs Fees Grossly in Excess of $1000 without Member Approval*

27. To advise BI on its formation and investment in the Project, legal counsel was hired. Naegele selected and hired such counsel.

28. While Weiner knew that Naegele had a longstanding business relationship with the counsel he selected, Naegele never informed Weiner of the extent of this relationship. Had Weiner known this information, he would have insisted that independent counsel be retained to draft the corporate formation agreements and provide advice and counsel on the Project.

29. Following investment in the Project, Weiner also learned that Naegele had earlier promised this Minnesota counsel and another financial advisor an investment interest in the Project. Weiner strongly objected to this promise because BI and Summit were relying heavily on the opinion of both of these individuals in relation to the Project investment; their independence was essential. Naegele has never disclosed the terms of these individual's investment interest in the Project or how much of that interest was paid for by a waiver of fees.

30. Disputes arose over payment of fees to Minnesota counsel, and, ultimately, both Naegele and Weiner personally paid certain amounts for the legal fees in late 2009. Weiner made this payment with the express agreement that he would not personally be liable for any further amounts owed to counsel. Naegele confirmed in writing that Weiner would not be personally responsible for any further amounts billed. Instead, either Naegele was to be personally liable for such fees or the Project would be billed for those expenses.

31. To ensure that the Project would be responsible for fees incurred on behalf of the project, several of the parties entered into a forbearance agreement. In that forbearance agreement, the borrowers and guarantors agreed "to concurrently pay all of Lender's (Summit's and BI's) outstanding past and ongoing legal fees, costs and expenses, and reimburse all of Lender's previously paid legal fees, in connection with or related to the Loans (the mezzanine debt and BI Loan), Loan Documents and/or the Defaults."

32. Following Naegele's agreement to be personally responsible for any other legal fees and the execution of the forbearance agreement, Naegele continued to engage Minnesota counsel, resulting in additional fees in excess of $100,000.00. While some of this work involved personal matters for Naegele and legal work for Niemi, the Project developer, Naegele had all such amounts billed to Summit and BI. Weiner never authorized expenses in this amount.

33. Naegele has not personally paid the additional legal fees incurred nor has he enforced the forbearance agreement which required the guarantors to take responsibility for such fees. Instead, he continues to seek payment of these costs from Wiener personally. .

## COUNT I:
### (Breach of the Duty of Loyalty)

34. Weiner reasserts and realleges the allegations made in ¶¶ 1 through 33 above.

35. Under the controlling documents, including the Articles of Incorporation and the Member Agreement, and under Minnesota law, Naegele owed a duty of loyalty to BI and its members including Weiner.

36. By his actions and his failure to act, Naegele has breached the duty of loyalty owed to BI and its members.

37. Weiner has been damaged by Naegele's breach.

## COUNT II:
### (Breach of the Duty of Good Faith and Fair Dealing)

38. Weiner reasserts and realleges the allegations made in ¶¶ 1 through 37 above.

39. Under the controlling documents, including the Articles of Incorporation and the Member Agreement, and under Minnesota law, Naegele owed a duty of good faith and fair dealing to BI and its members including Weiner.

40. By his actions and his failure to act, Naegele has breached the duty of good faith and fair dealing owed to BI and its members.

41. Weiner has been damaged by Naegele's breach.

## COUNT III:
### (Breach of the Duty of Full Disclosure)

42. Weiner reasserts and realleges the allegations made in ¶¶ 1 through 41 above.

43. Under the controlling documents, including the Articles of Incorporation and the Member Agreement, and under Minnesota law, Naegele owed a duty to fully disclose any material personal interest in any transactions to BI and its members including Weiner, before entering into such transactions on BI's behalf.

44. By his actions and his failure to act, Naegele has breached the duty to fully disclose his material personal interests in transactions that he entered purportedly on behalf of BI.

45. Weiner has been damaged by Naegele's breach.

## COUNT IV:
### (Breach of Contract)

46. Weiner reasserts and realleges the allegations made in ¶¶ 1 through 45 above.

47. The controlling documents, including the Articles of Incorporation and the Member Agreement, constitute enforceable contracts between the parties.

48. Those contracts required Naegele to act in good faith, to maintain his duty of loyalty to BI and its members, and to fully disclose any material interests in transactions in which BI was going to participate.

49. Those contracts further required Naegele to obtain majority approval for any Major Decisions, including the decision to expend any amounts in excess of $1000.

50. By his actions and his failure to act, Naegele has breached the contracts between the parties.

## COUNT V:
### (Declaratory Judgment)

51. Weiner reasserts and realleges the allegations made in ¶¶ 1 through 50 above.

52. A real and material dispute exists between the parties regarding their rights under the Member Control Agreement regarding enforcement of BI's legal rights under the Guaranty Agreements and the payment of legal fees incurred by Naegele.

53. Weiner is entitled to declaratory relief to establish his rights under the Member Control Agreement and payment of the legal fees incurred by Naegele.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Bruce Weiner requests that the Court:

1. Award compensation for damages suffered by plaintiff Bruce Weiner;

2. Declare the rights and obligations of the parties as prayed for;

3. Award reasonable attorneys' fees and costs and disbursements incurred herein; and

4. Award such other and further relief the Court deems just and equitable.

Dated: April 6, 2011

LARSON • KING, LLP

By: s/ Melissa M. Weldon
David Wilk (#222860)
Melissa M. Weldon (#275499)
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota 55101
Telephone: (651) 312-6500
Facsimile: (651) 312-6618

**ATTORNEYS FOR PLAINTIFF**

1306091